### S. D. Owens v. The State.

#### No. 2992. Decided March 23, 1904.

**1.—Selling Mortgaged Property—Evidence—Bill of Exception.**

Where the bill of exception did not exclude the idea that the testimony with reference to an unsecured account was offered to show defendant's fraudulent intent in the disposition of the particular mortgaged property with which he is charged, it can not be considered.

**2.—Evidence—Irrelevant Testimony.**

The fact that defendant's son afterwards traded away the property which he acquired for the mortgaged property, which defendant was alleged to have sold, no authority on part of defendant being shown to make said trade, and no issue being joined as to defendant's ability to discharge the mortgage, was immaterial and irrelevant.

**3.—Impeachment of Witness—Illegal Testimony.**

Where the State attempted to prove by defendant's son that he told the party to whom he traded the mortgaged property, with the unlawful disposition of which defendant was charged, that his father had sent him to make the trade, and the witness denied it; it was error to permit the State to then proceed to impeach him by another witness that he did make such statement; neither could such testimony be used for any legitimate purpose.

**4.—Evidence—Unconnected Transaction.**

It was error to introduce testimony with reference to another mortgage not mentioned in the indictment and not connected with the transaction for which defendant was being tried, charging him with the unlawful disposition of certain mortgaged property.

**5.—Indictment—Substitution—Original.**

There was no error, pending the substitution of the original indictment, to allow the trial to proceed upon such original after it was found.

**6.—Evidence.**

It was competent for appellant to prove that he went to the original mortgagee and proposed to pay off the mortgage to him, before the prosecution against him, charging him with unlawfully disposing of mortgaged property, was begun.

**7.—Same.**

See opinion for facts held by no means strong even if it be regarded as sufficient to authorize the conviction.

Appeal from the District Court of Delta. Tried below before Hon. H. C. Connor.

Appeal from a conviction of unlawfully disposing of mortgaged property; penalty, two years confinement in the penitentiary.

The testimony for the State shows that defendant gave a valid mortgage on two certain mules to Ike Davis, who afterwards assigned the same to B. B. Thomas. The disposition of the mules by defendant was shown inferentially by the purchaser, T. B. Youngblood, who testified that defendant and his son had stopped at his house in passing and that defendant had offered to trade his mules and surrey for some mules and a buggy, but that no trade was consummated, and defendant stated on leaving that if he did not make a certain land trade, he would return and make the mule trade. Defendant did not return, but his son and brother-in-law did. That defendant's son said his father had sent him with the mules and surrey to make the trade; that the trade was made and the purchaser gave $35 difference to the son. The defendant's son, whom the State used as a witness, denied that his father gave him authority to make the trade and that he made it because he needed the money and that $15 of the $35 was sent to defendant by his brother-in-law, who acted on the suggestion of defendant's son. That his father told him to take the mules and surrey to Delta, to defendant's home.

The other facts which are material are stated in the opinion.

*Stell & Hatcher,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of unlawfully disposing of mortgaged property, and his punishment assessed at confinement in the penitentiary for a term of two years; hence this appeal.

Appellant excepted to the action of the court permitting the tesimony of one Howard, to the effect that appellant was indebted to B. B. Thomas, transferee of the mortgage, an account amounting to $50 or $60, which was unsecured. The court explains this bill by showing that Howard went to see appellant, as the agent of Thomas, in order to collect the note for which the mortgage was given; and that appellant promised to pay the indebtedness due Thomas, and in that connection,

the matter of the account was brought out. The explanation does not show by whom this testimony was elicited. Of course, if it was elicited by appellant on cross-examination he could not complain. However, in connection wtih the bill it must be assumed that the testimony was brought out by the State, inasmuch as the bill shows that in effect, and the explanation does not show the contrary. It may be that testimony regarding other debts, in connection with the property or assets of appellant, is admissible in evidence to show his fraudulent intent in the disposition of the particular property; and the bill does not exclude the idea that the testimony was admissible for this purpose.

Appellant complains of the court permitting the State to prove by the witness Lee Owens the disposition of the property he got in his trade with Youngblood for the mules in question, to wit, that he traded one mule to a one-armed man at Quitman, and that he traded the other one to a man for a horse, at Sulphur Springs; and that the horse afterwards died. It appears that this trade was not made by appellant himself, but by his son, and that no authority is shown for it on the part of appellant; and we do not see how this became material. It certainly did not become material unless some issue was joined as to the ability of appellant to discharge the mortgage.

In bill number 3 appellant questions the action of the court permitting the State to ask Lee Owens the following question: "When you brought the mules to Mr. Youngblood, did you not go to the field where he was and tell him 'my father sent me to make the trade with you about the mules he was talking to you about the other day?'" To which the witness answered, "I did not." And then, as shown by bill number 4 the State was permitted to prove by Youngblood that when Lee Owens brought the mules to his house, he told him his father had sent him to make the trade with him about the mules, he had talked with him before. This was objected to on the ground that defendant was not present when the statement was made, and the testimony was hearsay; that the statement of Lee Owens to Youngblood was immaterial, and was calculated to make the jury attribute the statements to defendant. The court explains the admission of this testimony by stating that Lee Owens, son of defendant, testified that his father did not authorize him to sell or trade said mules; and the said witness Lee Owens did not tell Youngblood that his father had so instructed him. The testimony was admitted for the purpose of impeaching Lee Owens, and as original evidence in the event the jury should believe from all the testimony, independent of such statements, that the defendant had authorized the witness Lee Owens to trade said mules, upon which issue the jury were fully instructed in the last paragraph of the court's charge. It appears by these two bills that the State attempted to prove by Lee Owens, who was its witness, the fact that he told Youngblood, the party to whom he traded the mules, that his father had sent him to make the trade. The witness denied this. Under all the authorities

his mere denial or failure to testify to a certain fact would not authorize the State to impeach its own witness. This can only be done where the witness makes affirmative testimony injurious to the State's case, and which testimony is a surprise to the State. This was not the case here. The court's further explanation, that he admitted the testimony only to be weighed by the jury in case from other evidence they should find appellant had authorized his son to trade the mules, is equally without merit. The court did attempt to limit this testimony by the following charge, which is also complained of: "You will not consider the testimony of the witness P. B. Youngblood, as to what Lee Owens told him that the defendant said at the time when he delivered the mules, except upon the issue of the credibility of the witness Lee Owens, unless you believe from the evidence, independent of such evidence of said Youngblood, that the defendant had instructed Lee Owns to trade the mules to the said Youngblood." If there was other evidence establishing the fact of authority on the part of appellant, authorizing his son Lee Owens, to trade the mules, the jury would not need this testimony. It could only be used to strengthen that point in the case; that is, the authority of appellant to his son, Lee Owens, to trade the mules, and it is difficult to see how the jury could refrain from using such illegal testimony as evidence of autnority, notwithstanding the court attempted to safeguard it by the charge in question. In the first place the evidence should not have been admitted, and could serve no legitimate purpose in the case. Its effect would be only to prejudice appellant by illegal testimony.

We do not believe it was competent for the State to prove by the witness Lee Morgan, as was done, that he held a valid and existing mortgage on the carriage sold to Youngblood. This was proof of another and distinct offense in nowise connected with the transaction for which appellant was being tried; and did not shed any light on the offense charged against appellant.

There is no error in the action of the court in regard to substituting the indictment, and then allowing the trial to proceed on the original indictment after it was found. The court's explanation shows there was no order substituting the indictment, and pending the substitution the original was found.

We believe it was entirely competent for the appellant to prove that he went to the original mortgagee, Davis, and proposed to pay off the mortgage to him, as we understand this was before any prosecution was begun. In this connection we would observe that the testimony on which appellant was convicted is by no means strong—even if it be regarded as sufficient to authorize this conviction. According to the account given by the witness Davis, to whom the mortgage was executed, he says that defendant offered to pay him the debt secured by the mortgage, but he told him to pay B. B. Thomas' account, and that he would carry the mortgage debt over another year; that he and

Thomas had arranged for defendant to do this, as Thomas' account was unsecured, and Thomas had agreed with him (witness) to buy the mortgage he held if he would let Owens pay his unsecured debt. But defendant knew nothing of this, and did not agree to it. It is further shown by this witness that Thomas did not pay him for the mortgage when it was turned over to him, and the payment was not made until about the time this prosecution was begun, about a year afterwards. Thomas says, in explaining this matter, that Davis was going to foreclose the mortgage on the mules, and he hated to see Davis take his team away from him and knock him out of making a crop was the reason he took up the mortgage. This view is not supported by the testimony of Davis himself. It looks to us very much like an attempt on the part of Davis and Thomas, by the use of the mortgage, to force appellant to pay Thomas' unsecured debt. We do not believe the law contemplates the use of the mortgage for any such purpose. In connection with this, there is another view. The Davis mortgage was properly registered, and the mules were evidently subject to the mortgage; but it does not appear that any attempt was made to collect the debt in this way.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*